IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 22-996

Filed 12 September 2023

Mecklenburg County, Nos. 20CRS203878-81, 20CRS9804

STATE OF NORTH CAROLINA

v.

ERIC WRIGHT, Defendant.

Appeal by Defendant from amended order entered 28 July 2022 by Judge Lisa Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 23 May 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Caden W. Hayes, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katy Dickinson-Schultz, for Defendant-Appellant.*

RIGGS, Judge.

Defendant Eric Wright appeals an order denying his motion to suppress evidence found during a stop on 29 January 2020. On appeal, Mr. Wright first argues that the officers did not have reasonable suspicion to stop Mr. Wright. Second, Mr. Wright argues that he did not consent to the search of his backpack. Finally, Mr. Wright argues that the confidential informant's statement was not sufficient to establish probable cause for a warrantless search.

After review, we hold that law enforcement had reasonable suspicion to stop

and frisk Mr. Wright based upon the informant's tip; however, Mr. Wright did not voluntarily consent to the search of his backpack, and the search was not otherwise justified by probable cause. Therefore, we reverse the trial court's order denying Mr. Wright's motion to suppress the evidence.

## I.    FACTS & PROCEDURAL HISTORY

On 29 January 2020, around 11:30 p.m., Officer Christopher Martin ("Officer Martin") and Officer Nicholas Krause ("Officer Krause") of the Charlotte-Mecklenburg Police Department were on routine patrol in uptown Charlotte. Officer Martin received a tip from a known informant that there was an individual carrying an illegal firearm on Phifer Avenue. The informant described the individual, who was traveling on a bicycle, as a Black male with dreadlocks wearing a dark jacket, bright orange tennis shoes and blue jeans. Shortly after receiving this tip, the officers located an individual on Phifer Avenue who matched this description and was later identified as Mr. Wright. The officers followed Mr. Wright as he walked with his bicycle down North Tryon Street.

Officer Benjamin Slauter ("Officer Slauter") followed Mr. Wright on foot as he turned onto a dirt path near the East 12th Street bridge. Officers Martin and Krause parked their vehicle close to the intersection of East 12th Street and North College Street to meet Mr. Wright as he emerged from the dirt path on North College.

Before they intercepted Mr. Wright, the officers had the following conversation in their vehicle:

OFFICER MARTIN: That's trespass, right?

OFFICER KRAUSE: Yes.

OFFICER MARTIN to Officer Slauter via radio: Slauter,
that area's trespassing right?

OFFICER SLAUTER: Known drug area, that's all I got.
Voluntary contact.

Officers Martin and Krause exited their vehicle and approached Mr. Wright on North College Street. The officers gave Mr. Wright conflicting reasons for approaching him, with Officer Krause stating that Mr. Wright was trespassing on the dirt path and Officer Martin stating that the area was known for street-level drug sales. At the hearing on 9 November 2020, Officer Martin testified that he decided to approach Mr. Wright based on the information he received from the known informant.

The officers asked Mr. Wright for his name and identification, and they also asked whether he was homeless. Mr. Wright provided his identification, told the officers he was homeless, and said that he was headed to a storage unit on College Street. Officer Martin asked Mr. Wright to step off his bicycle and remove his backpack and Mr. Wright complied with these requests. Officer Martin asked if he could perform a pat-down of Mr. Wright's person and Mr. Wright consented to the pat-down. Officer Martin did not find any weapons on Mr. Wright during the pat-down.

Officer Martin then asked if he could search Mr. Wright's backpack to make

sure that he did not have a weapon. At this point in the encounter, Officers Martin and Slauter were standing on either side of Mr. Wright and Officer Krause was in the police vehicle with Mr. Wright's identification. Initially, Mr. Wright agreed to let Officer Martin search his backpack, but then quickly, before Officer Martin started searching, said that he did not want the officers to look in the backpack. Officer Martin and Officer Slauter asked Mr. Wright four more times for permission to search his backpack, and each time, Mr. Wright said no.

Even though Mr. Wright said that he was cold and scared of the police, Officer Slauter indicated that they were "looking for somebody" and could not take Mr. Wright "off the list" because he was being "deceptive." Officer Slauter asked Mr. Wright to open the backpack so that Officer Slauter could look inside, and Mr. Wright finally did as he was directed. Mr. Wright put the backpack on the ground and showed Officer Slauter some of the items inside the backpack. Officer Slauter saw a pistol grip in the backpack and placed Mr. Wright in handcuffs.

Officer Slauter conducted a thorough search incident to arrest and found cocaine and marijuana in Mr. Wright's pockets. The officers ran the serial number of the gun and found that it was a stolen firearm.

Mr. Wright was indicted on 10 February 2020 for unlawfully carrying a concealed weapon, possession with intent to sell cocaine, possession of a stolen firearm, possession of a firearm by a felon, and obtaining habitual felon status. On 2 September 2020, Mr. Wright filed a motion to suppress the evidence obtained from

the search and seizure.[1]  At a hearing on the motion to suppress held on 9 November 2020, the trial court denied Mr. Wright's motion.  The trial court found that the initial contact between Mr. Wright and the officers was voluntary, and Mr. Wright consented to the search of his backpack.  The trial court also found that the information provided by the confidential informant, combined with the officers' knowledge of the area, was enough to provide reasonable articulable suspicion to engage Mr. Wright.  Mr. Wright gave oral notice of intent to appeal the denial of the motion to suppress.  Mr. Wright entered an *Alford* plea to all charges and was sentenced to a minimum of 87 months and a maximum of 117 months of incarceration.

Mr. Wright originally appealed the denial of the motion to suppress in November 2020.  In that appeal, this Court remanded the case for further findings of fact and conclusions of law regarding trespass, including but not limited to whether law enforcement believed that Mr. Wright was trespassing, whether this belief was reasonable, and the impact this would have on reasonable suspicion.  *State v. Wright*, ___ N.C. App. ___, ___, 871 S.E.2d 879, ___ (2022) (unpublished).  The Court indicated that the additional findings should be based upon the evidence presented at the 9 November 2020 hearing.

On 28 July 2021, the trial court entered an amended order denying the motion

---

[1] Mr. Wright also filed a motion to suppress statements on 29 October 2020.  That motion is not a subject of this appeal.

to suppress evidence ("Amended Order"). The trial court made the following additional findings of fact related to trespassing:

> 5. A "No Trespassing" sign was affixed to one of the bridge pylons and was clearly visible to a person traveling under the underpass. Defendant's path of travel took him directly by this sign.
>
> 6. Officer Slauter observed Defendant enter a pathway marked by a "No Trespassing sign" leading from North Tryon to N. College Street. The "No Trespassing" sign was posted underneath the overpass next to the pathway.
>
> 7. Another sign was on the ground next to the fence that ran along one side of the dirt path. This sign read, "Mecklenburg County Property No Trespassing Violators will be subject to arrest and conviction."
>
> 8. The dirt path the Defendant entered was marked on both sides by no trespassing signs. It was obscured by vegetation, indicating it was not a maintained path intended for the public to use.
>
> 9. Defendant traveled along this dirt path for approximately 1500 to 2000 feet.
>
> …
>
> 11. The officers believed the Defendant was trespassing.
>
> …
>
> 20. That Officer Martin appeared to have retuned [sic] Defendant's identification card based on the conversation between them and the actions that were visible on the BWC.

The trial court made additional conclusions of law, which stated:

> 2. Based on the presence of two "No Trespassing" signs, including one that advised "violators will be subject to

- 6 -

arrest and conviction," along with the officers' knowledge of the area and prior experience of having issued citations in the area provided the officers with reasonable belief that the Defendant was trespassing.

3. The information provided by the confidential informant and the officer's reasonable belief that the Defendant was trespassing combined with the officers' knowledge of the area was sufficient as to provide reasonable and articulable suspicion and probable cause for the Officers to engage with the Defendant.

On 18 August 2022, Mr. Wright filed a written notice of appeal from the Amended Order. As his notice was filed more than fourteen days after the entry of the order, Mr. Wright filed a petition for a writ of *certiorari* contemporaneously with his appeal.

## II. ANALYSIS

### A. Writ of *Certiorari* Granted

A party may appeal an order of a superior court in a criminal action by giving oral notice of appeal at trial or by filing notice of appeal within fourteen days of the entry of the order. N.C. R. App. P. 4(a) (2023). Mr. Wright did not give oral notice of appeal from the Amended Order and his written notice of appeal was filed twenty-two days after the entry of the order. However, this Court may grant a writ of *certiorari* in appropriate circumstances to permit review of an order of a trial court when, as in this case, the right to prosecute an appeal has been lost by failure to take timely action. N.C. R. App. P. 21(a) (2023). *Certiorari* is a discretionary writ, to be issued only for good and sufficient cause shown. *State v. Grundler*, 251 N.C. 177, 189,

111 S.E.2d 1, 9 (1959).

We hold that Mr. Wright has shown good cause and that the arguments he presents on appeal have merit. Accordingly, we grant Mr. Wright's petition for *certiorari* to review the question of whether the trial court erred by denying his motion to suppress evidence.

## B. Standard of Review.

The scope of appellate review of an order denying a motion to suppress evidence is limited to determining whether the trial court's underlying findings of fact are supported by competent evidence, in which case, they are binding on appeal, and whether those factual findings support the trial court's conclusions of law. *State v. Terrell*, 372 N.C. 657, 665, 831 S.E.2d 17, 22 (2019). Uncontested findings of fact are binding on appeal. *State v. Ashworth,* 248 N.C. App. 649, 651, 790 S.E.2d 173, 176 (2016). The trial court's conclusions of law are reviewed *de novo. Terrell,* 372 N.C. at 665, 831 S.E.2d at 22.

## C. Findings of Fact.

Mr. Wright challenges Findings of Fact 5, 6, 7, 8, 11, and 20 of the trial court's Amended Order as unsupported by competent evidence. We hold that Findings 6, 8, 11, and 20 are indeed unsupported by competent evidence. The remainder of the findings remain undisturbed.

Finding 6 states: "Officer Slauter observed Defendant enter a pathway marked by a 'No Trespassing sign' leading from North Tryon to N. College Street. The 'No

Trespassing' sign was posted underneath the overpass next to the pathway." While there is evidence to support the finding that a "No Trespassing" sign was posted underneath the overpass, Officer Slauter did not testify that he observed Mr. Wright enter a pathway marked by a "No Trespassing" sign and there is no evidence that the pathway itself—as opposed to the pylon under the overpass—was marked by such a sign. To find a defendant guilty of trespassing, a court must find that there is a posting "in a manner reasonably likely to come to the attention of intruders," putting them on notice not to enter the premises. N.C. Gen. Stat. § 14-159.13 (2021). The "No Trespassing" sign is affixed to the overpass pylon a few yards from the pathway. While this sign would be reasonably likely to come to the attention of persons walking under the bridge along North Tryon Street, the positioning of the sign would reasonably give notice to a passerby to avoid trespassing on the bridge abutment directly behind the sign, rather than providing notice to avoid trespassing on a dirt path several yards to the side of the sign and barely visible in the photos provided to this Court. Because there was no competent evidence to support the finding that Officer Slauter observed Mr. Wright enter a pathway marked by a "No Trespassing" sign, we strike Finding 6 from the Amended Order.

Finding 8 states: "The dirt path the Defendant entered was marked on both sides by no trespassing signs. It was obscured by vegetation, indicating that it was not a maintained path intended for the public to use." The first sentence is not supported by competent evidence as there is no evidence that the pathway Mr. Wright

entered was marked on both sides. As discussed *supra*, the "No Trespassing" sign on the bridge pylon does not mark the dirt path. Additionally, Officer Martin testified that the "No Trespassing" sign on the ground inside the chain link fence referred to the empty lot inside the fence. The trial court's finding that these signs together marked the pathway mischaracterizes the placement and reasonably understood meaning of the signs and is not supported by competent evidence. Thus, we strike Finding 8 from the Amended Order.

Finding 11 states: "The officers believed the Defendant was trespassing." This finding is not supported by competent evidence. Prior to stopping Mr. Wright, the officers disagreed about whether Mr. Wright was trespassing on the pathway. In conversation amongst themselves before the stop, Officer Krause stated that Mr. Wright was trespassing when he was on the pathway, but Officer Martin asked Officer Slauter if it was trespass and Officer Slauter, who was walking on the pathway, indicated to the contrary that Mr. Wright was in an area known for street-level drug sales and police would have to make voluntary contact. After the fact, at the hearing, Officer Martin testified that he decided to make contact with Mr. Wright based on the tip from the confidential informant. Officer Slauter testified that he said "voluntary contact" to avoid sharing information about the confidential informant. On redirect, Officer Slauter testified somewhat equivocally that he thought "it's trespassing through the area" but he does not normally "arrest people for trespass." Officer Krause, the only officer to indicate that he suspected

trespassing at the time of the encounter, did not testify. Thus, the evidence does not support the finding that the officers, at the time of the encounter, believed Mr. Wright was trespassing. Therefore, we strike Finding 11 from the Amended Order.

Finding 20 states: "Officer Martin appeared to have returned Defendant's identification card based on the conversation between them and the actions that were visible on the bodycam footage ("BWC")."[2] This finding is not supported by the BWC. At the beginning of the encounter, Officer Martin asked Mr. Wright if he had identification. Mr. Wright gave his identification to Officer Krause, who took the identification back to the police vehicle. The videos show that Officer Krause did not return until after the officers had searched Mr. Wright's backpack, found the gun, and placed him in handcuffs. The videos also show Officer Krause holding an object that appears to be Mr. Wright's identification after Mr. Wright is handcuffed; while holding the identification, Officer Krause is asking Mr. Wright about his criminal history. The competent evidence does not support the finding that the officers returned Mr. Wright's identification prior to the search. Therefore, we strike Finding 20 from the Amended Order.

After careful review, we strike Findings 6, 8, 11, and 20 and leave the remainder of the findings of fact undisturbed.

---

[2] Neither Officer Martin nor Officer Slauter testified that they returned Mr. Wright's identification before the search, and this finding of fact appears to be based solely on the bodycam footage.

**D. The Trial Court Erred in Denying Mr. Wright's Motion to Suppress**

On appeal, Mr. Wright argues that the trial court erred in denying the motion to suppress because he did not freely consent to the search of his backpack and the officers did not have probable cause to search the backpack. We hold that the officers had reasonable suspicion to stop, question, and perform a protective search of Mr. Wright based on the informant's tip. However, Mr. Wright did not voluntarily consent to the search of his backpack, and the officers did not have probable cause to search the backpack. Therefore, the trial court erred in denying Mr. Wright's motion to suppress the evidence.

1. ***The officers had reasonable suspicion to stop and frisk Mr. Wright, but the search of the backpack exceeded the scope of the initial justified frisk.***

The Fourth Amendment to the U.S. Constitution guarantees citizens the right to be secure in their person against unreasonable search and seizure. U.S. Const. amend. IV. The Fourth Amendment is applied against state governments through the Fourteenth Amendment, and comparable protection is afforded by the North Carolina Constitution. N.C. Const. Art. 1, § 20; *Mapp v. Ohio*, 367 U.S. 643, 655, 6 L. Ed. 2d 1081, 1090 (1961). A brief investigatory detention by law enforcement constitutes a seizure under the Fourth Amendment. *State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69-70 (1994); *Reid v. Georgia*, 448 U.S. 438, 440, 65 L. Ed. 2d 890, 893-94 (1980). However, only unreasonable investigatory stops are unconstitutional. *Watkins,* 337 N.C. at 441, 446 S.E.2d at 70. When a law enforcement officer has a

reasonable suspicion that a suspect has committed or is about to commit a crime, they may briefly seize the suspect and make reasonable inquiries aimed at confirming or dispelling the suspicion. *Minnesota v. Dickerson*, 508 U.S. 366, 373, 124 L. Ed. 2d 334, 344 (1993). An officer has a reasonable suspicion if a "reasonable, cautious officer, guided by his experience and training," would believe that criminal activity is afoot "based on specific and articulable facts, as well as the rational inferences from those facts." *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 167 (2012) (quoting *Watkins*, 337 N.C. at 441-42, 446 S.E.2d at 70). The stop must be justified at its inception and reasonably related in scope to the criminal activity that the officer suspects is occurring. *Terry v. Ohio*, 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905 (1968).

An informant's tip can provide the requisite reasonable suspicion for an investigatory stop. *Alabama v. White*, 496 U.S 325, 330, 110 L. E. 2d 301, 309 (1990). Reasonable suspicion, like probable cause, is dependent upon both the content of the information possessed by police and its degree of reliability. *Id.* While the reasonable suspicion standard is less demanding than probable cause, it still requires that an informant's tip carry some "indicia of reliability." *State v. Watkins*, 120 N.C. App. 804, 809, 463 S.E.2d 802, 805 (1995) (quoting *White*, 496 U.S. at 332, 110 L. Ed. at 310). In evaluating whether an informant's tip sufficiently provides indicia of reliability, we consider the "totality-of-the-circumstances." *State v. Williams*, 209 N.C. App. 255, 263, 703 S.E.2d 905, 910 (2011) (quoting *Illinois* v. Gates., 462 U.S. 213, 233, 76 L. Ed. 2d 527, 545 (1983)). In weighing the reliability of an informant's

tip, the court must consider the informant's veracity, reliability, and basis of knowledge. *Williams*, 209 N.C. App. at 262, 703 S.E.2d at 910 (quotation omitted).

Officer Martin testified at trial that he ultimately decided to stop Mr. Wright based on the tip from the confidential informant. Therefore, to determine whether the officers had the requisite reasonable suspicion to stop Mr. Wright, we must evaluate the reliability of the tip. At the hearing, Officer Martin testified that he had known the informant for about a year and had been able to corroborate information from the informant in the past; this history with the informant creates a stronger case for the reliability of the tip. *See Williams*, 209 N.C. App. at 262-63, 703 S.E.2d at 910 ("Where the informant is known or where the informant relays information to an officer face-to-face, an officer can judge the credibility of the tipster first-hand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion.")

According to Officer Martin, the informant described the individual as a Black male with dreads wearing a dark jacket, bright orange tennis shoes, and blue jeans traveling on a bicycle; however, "reasonable suspicion does not arise merely from the fact that the individual encountered met the description given to the officer." *State v. Hughes*, 353 N.C. 200, 209, 539 S.E.2d 625, 632 (2000). When considering the totality of the circumstances here, we conclude the officer's history with the informant and the testimony about his ability to corroborate prior information from this informant, provides a minimal level of objective justification to establish reasonable suspicion for the *Terry* stop and frisk. *See State v. Maready,* 362 N.C. 614, 619, 669

S.E.2d 564, 567 (2008) ("When police act on the basis of an informant's tip, the indicia of the tip's reliability are certainly among the circumstances that must be considered in determining whether reasonable suspicion exists.").

Because we hold that the officers had reasonable suspicion to believe Mr. Wright was armed, they were authorized to perform a protective search of Mr. Wright for weapons. When an officer has reason to believe an individual that they have lawfully stopped is armed and dangerous, the officer may conduct a reasonable search for weapons that may be used to harm the officer or others nearby. *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909; *State v. Johnson*, 246 N.C. App. 677, 692, 783 S.E.2d 753, 764 (2016). The scope of the search must be strictly limited to that which is necessary to determine whether an individual has a weapon on their person, and therefore consists of a pat-down of the individual's outer layer of clothing. *See State v. Smith*, 150 N.C. App. 317, 321, 562 S.E.2d 899, 902 (2002) ("A *Terry* frisk generally contemplates a limited pat-down of the outer clothing of an individual").

The pat-down of Mr. Wright's person was justified as a limited, protective search for weapons that could have been used to harm the officers. *Smith*, 150 N.C. App. at 321, 562 S.E.2d at 902 ("[A] protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'"). The pat-down did not reveal any weapons. Once the *Terry* frisk was complete, the officers could make inquiries of Mr. Wright to

confirm or dispel their suspicions without fear of harm. *Smith*, 150 N.C. App. at 321, 562 S.E.2d at 902. Any search of the backpack would be beyond the scope of a *Terry* frisk. *State v. Shearin*, 170 N.C. App. 222, 226, 612 S.E.2d 371, 375–76 (2005) (stating the scope of the search under *Terry* is protective in nature and is limited to the person's outer clothing and to the search for weapons that may be used against the officer).

We hold that the officers had reasonable articulable suspicion to briefly detain Mr. Wright based on the tip from the confidential informant. The officers were also justified in performing a protective *Terry* frisk for weapons on Mr. Wright's person. However, the search of the backpack was not justified as part of the frisk because it exceeded the scope of what was necessary to ensure that Mr. Wright did not have a weapon on his person and did not pose a threat to the officers.

### 2. The search of Mr. Wright's backpack was not lawful.

Mr. Wright did not consent to the search of his backpack and the search was not otherwise justified by probable cause. Therefore, the search of Mr. Wright's backpack was not lawful.

*a. Mr. Wright did not consent to the search of his backpack.*

A search of private property conducted without a warrant is *per se* unreasonable unless the search falls within a well-delineated exception to the

warrant requirement.[3] *State v. Cooke*, 306 N.C. 132, 135, 291 S.E.2d 618, 620 (1982); *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585 (1967). "Consent, however, has long been recognized as a special situation excepted from the warrant requirement, and a search is not unreasonable within the meaning of the Fourth Amendment "when lawful consent to the search is given." *State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1997) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 36 L. Ed. 2d 854, 860 (1973). The North Carolina General Assembly allows law enforcement officers to conduct searches without a warrant or other authorization if consent to the search is given. N.C. Gen. Stat. § 15A-222(1) (2021).

For a "warrantless, consensual search to pass muster under the Fourth Amendment, consent must be given and the consent must be voluntary." *Smith*, 346 N.C. at 798, 488 S.E.2d at 213. "We treat the question of voluntariness as a conclusion of law." *State v. Cobb*, 248 N.C. App. 687, 695, 789 S.E.2d 532, 538 (2016). In determining what constitutes 'voluntary' consent, two competing concerns must be accommodated—"the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Schneckloth*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 863 (1973). To be voluntary, consent must be free from coercion,

---

[3] Recognized exceptions to the warrant requirement include: a protective search upon reasonable suspicion as described in Section D1, *Terry*, 392 U.S. 1, 30-31, L.Ed.2d 889, 911; seizure of suspicious items that are in plain view if the officers possess the legal authority to be on the premise, *State v. Allison*, 298 N.C. 135, 140, 257 S.E.2d 417, 420 (1979); when probable cause exists and the exigencies of the situation make a search without a warrant imperative, *Allison*, 298 N.C. 135, 141, 257 S.E.2d 417, 421; and search incident to a lawful arrest, *State v. Cherry*, 298 N.C. 86, 92, 257 S.E.2d 551, 556 (1979).

express or implied. *State v. Little*, 270 N.C. 234, 239, 154 S.E.2d 61, 65 (1967); *State v. Romano*, 369 N.C. 678, 691, 800 S.E.2d 644, 653 (2017).

In examining whether the consent was the product of coercion, the court must consider the possibility of subtly coercive questions from those with authority, as well as the possibly vulnerable subjective state of the person who consents. *Schneckloth*, 412 U.S. at 225-26, 36 L. Ed. 2d at 862. Whether consent is voluntary is based upon the totality of the circumstances, *Smith*, 346 N.C. at 798, 488 S.E.2d at 213, and the State has the burden of proving consent was voluntarily given. *State v. Long*, 293 N.C. 286, 293, 237 S.E.2d 728, 732 (1977); *Bumper v. North Carolina*, 391 U.S. 543, 548, 20 L. Ed. 2d 797, 802 (1968).

Based upon a review of the totality of the circumstances, Mr. Wright's consent to search the backpack was a product of coercion, albeit not ill-intentioned, and was not voluntary. Officers Martin and Slauter together asked Mr. Wright five times within a period of about one and a half minutes for permission to search the backpack, even though Mr. Wright continued to say no.[4] The officers had a duty to respect Mr. Wright's assertion of his Fourth Amendment right to say no to the request to search. *See United States v. Drayton*, 536 U.S. 194, 207, 153 L. Ed. 2d 242, 255 (2002) ("In a society based on law, the concept of agreement and consent should be given a weight

---

[4] A sister state's intermediate court considered repeated requests for consent to search as a factor that supports the conclusion that a reasonable person would believe that compliance with the officer's request was mandatory. *See Kutzorik v. State*, 891 So.2d 645, 648 (Fla.App. 2 Dist. 2005).

and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion.").[5] However, the officers did not act in reliance on Mr. Wright's response; instead, Officer Slauter told Mr. Wright they were "specifically looking for somebody" and they could not take Mr. Wright "off the list" because he was being "deceptive." The statement strongly communicates that Mr. Wright would not be allowed to leave unless he consented to the search. *Schneckloth*, 412 U.S. at 225-26, 36 L. Ed. 2d at 862.

During the interaction in the middle of the night, Mr. Wright, an older homeless man, told the officers he was cold and afraid of the police. Throughout the conversation, Officers Martin and Slauter were standing on either side of Mr. Wright and Officer Krause had Mr. Wright's identification in the police vehicle. The combination of multiple uniformed police officers surrounding an older homeless man and making repeated requests to search his backpack on a cold, dark night after he repeatedly asserted his right not to be searched leads us to the conclusion that Mr. Wright's consent was the result of coercion and duress and therefore was not freely

---

[5] As Justice Kennedy noted during oral argument: "It seems to me a strong world is when officers respect people's rights and—and people know what their rights are and—and assert their rights [and say to the police] I don't want to be searched. . . . I don't want to be searched. Leave me alone." Oral argument at 47:40, *United States v. Drayton*, 536 U.S. 194 (2002) (No. 01-631) https://www.oyez.org/cases/2001/01-631.

given. *Schneckloth*, 412 U.S. at 228, 36 L. Ed. 2d at 863 ("[N]o matter how subtly the coercion were applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.").

b. *The officers did not have probable cause to search the backpack.*

Here, the officers needed probable cause for a warrantless search of Mr. Wright's backpack. To determine if probable cause exists based upon an informant's tip, we apply the totality-of-the-circumstances test which considers the informant's reliability and basis of knowledge. *State v. Benters*, 367 N.C. 660, 664, 766 S.E.2d 593, 598 (2014). Probable cause exists when there is "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty." *State v. Yates*, 162 N.C. App. 118, 122, 589 S.E.2d 902, 904 (2004) (quoting *State v. Harris*, 279 N.C. 307, 311, 182 S.E.2d 364, 367 (1971)).

In this case, the informant's tip was lacking in both the reliability and basis of knowledge that would be necessary to create probable cause. Officer Martin's testimony confirmed that the informant was known to him for a year and a half; however, Officer Martin did not testify that information from the informant had led to prior arrests. *Cf. State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984) ("[t]he fact that statements from the informants in the past had led to arrests is sufficient to show the reliability of the informants"). Although Mr. Wright matched the description provided by the informant, corroboration of mere identifying

information, such as the suspect's description and location, is not enough to indicate that a tip is reliable. *State v. Johnson*, 204 N.C. App. 259, 264, 693 S.E.2d 711, 715 (2010) ("Where the detail contained in the [anonymous] tip merely concerns identifying characteristics, an officer's confirmation of these details will not legitimize the tip."). The informant said there was an individual carrying a firearm on Phifer Avenue; however, the informant did not provide any basis for his knowledge about the criminal activity—unlawful possession of a firearm. *See Florida v. J.L.,* 529 U.S. 266, 272, 146 L. Ed. 2d 254, 261 (2000) (noting that the reliability of a tip requires reliability in the "assertion of illegality, not just in its tendency to identify a determinate person."). Put another way, neither the confidential informant, nor the officer testifying as to his relationship with the informant, provided enough information on the reliability or basis of knowledge of the tip to create more than the reasonable suspicion necessary to justify the *Terry* frisk; not to create probable cause. Additionally, the tip did not predict any future behavior; a characteristic of a tip that the U.S. Supreme Court has held can demonstrate the informant is not only honest but also well-informed. *See White*, 496 U.S. at 332, 110 L. Ed. 2d at 310 (holding that an anonymous tip can be corroborated by its accurate prediction of future activity).

Therefore, neither the informant's tip nor the *Terry* frisk provided the officers with probable cause for a warrantless search of Mr. Wright's backpack. *Terry*, 392 U.S. at 25-26, 20 L. Ed. 2d at 908. While we held that the informant's tip had an indica of reliability to establish reasonable suspicion for the stop, the tip was

insufficient to establish the higher threshold of probable cause to search the backpack. *Cf. Adams v. Williams*, 407 U.S. 143, 144, 147, 32 L. Ed. 2d 612, 616, 617 (1972) (holding that the unverified tip from a known informant was sufficient for reasonable suspicion to support an investigatory stop but the Court noted that such an unverified tip may not be sufficient to support probable cause).

Because the informant's tip did not provide a basis of knowledge for the allegation that Mr. Wright had an illegal firearm, we hold that the informant's tip was insufficient to provide probable cause to search the backpack. Therefore, the warrantless search of Mr. Wright's backpack was not justified, and the evidence obtained from that illegal search must be excluded.

## III.    CONCLUSION

After careful review of the issues identified in Mr. Wright's brief, we hold that the trial court's Findings of Fact 6, 8, 11, and 20 were not properly supported by competent evidence. Additionally, we hold that the trial court erred in denying Mr. Wright's motion to suppress because the search that yielded the evidence was not lawful. Accordingly, we reverse the court's order denying Mr. Wright's motion to suppress the evidence and vacate the *Alford* plea.


REVERSED AND VACATED.

Judges HAMPSON and FLOOD concur.